**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JAMES ILDEFONSO,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No.: 11-cv-4033** |
| | : | **Jury Trial** |
| **CITY OF BETHLEHEM and** | : | |
| **RALPH CARP, individually and in his** | : | |
| **official capacity,** | : | |
| **Defendants.** | : | |

<u>**MEMORANDUM  AND  ORDER**</u>

**LYNNE A. SITARSKI**                                                      **DATE:   July 12, 2012**
**UNITED STATES MAGISTRATE JUDGE**

Plaintiff James Ildefonso ("Plaintiff") brings this action against his current employer the

City of Bethlehem and the Director of the Parks and Public Property, Ralph Carp, (collectively

"Defendants") claiming employment discrimination in violation of Title VII of the Civil Rights

Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*.; the Civil Rights Act of 1866, 42 U.S.C. §

1981, 42 U.S.C. § 1983; and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons.

Stat. § 951 *et seq*.

Presently before the Court is Defendants' Motion for Summary Judgment and Plaintiff's

Response.  For the reasons set forth herein, Defendants' Motion for Summary Judgment is

**GRANTED.**

## I.      BACKGROUND

Plaintiff claims that his employer and his department director discriminated against him

on the basis of his race.  Specifically, Plaintiff raises claims of disparate treatment based on

unequal disciplinary measures and a failure to promote (Counts I and III).  The discipline issue

arises from an altercation between Plaintiff and his co-worker, Chuck Yenca.  The failure to promote pertains to a Class 12 pesticide sprayer position.  Plaintiff argues that both issues, discipline and promotion, should be viewed in the context of Ralph Carp's allegedly racially insensitive comments.  Plaintiff also raises an equal protection claim based on Defendants' refusal to reimburse Plaintiff for certain fees related to his pesticide license and the refusal to allow Plaintiff to work at the ice rink (Count II).  Plaintiff argues that his equal protection claim should be considered in the context of the racial profile of the City.  (Doc. No. 4) (Transcript of Hearing, 05/29/12, p. 30-40).

On March 27, 2012, Defendants filed a Motion for Summary Judgment and a Statement of Material Undisputed Facts.  (Doc. Nos. 20 & 21).  Plaintiff's Answer to Defendants' Motion for Summary Judgment was filed on April 26, 2012.  (Doc. No. 23).  Plaintiff also filed a Response to Defendants' Statement of Material Undisputed Facts.  (Doc. No. 23-2).  The Court heard oral argument on May 29, 2012.  The matter is now ripe for disposition.


## II.    FACTS

Viewing the evidence and drawing all reasonable inferences in the light most favorable to Plaintiff, the non-moving party, the relevant facts are as follows.

Plaintiff is an adult Hispanic male.  (Doc. No. 20, ¶ 2) (Doc. No. 1, ¶ 7).  Plaintiff has been employed by the City of Bethlehem ("City") since May 1993 and has been assigned to the Department of Parks and Public Property ("Parks Department") since 2001.  (Doc. No. 20, ¶ 1).  Plaintiff had at least two discipline issues at work prior to his transfer to the Parks Department in 2001.  (Doc. No. 20, ¶ 5) (Doc. No. 23-2, ¶¶ 5, 93).  Plaintiff contends that he did not experience

any discrimination during his employment with the City of Bethlehem until after 2007, when Ralph Carp ("Carp") became Director of the Parks Department.  (Doc. No. 20, ¶ 5).  Carp apparently has been aware of Plaintiff's national origin since late 2007.  (Doc. No. 20, ¶ 35).

As Director of the Parks Department, Carp oversees the divisions of parks, buildings, and golf course.  (Doc. No. 23-2, ¶ 77).  Carp is responsible for approximately forty-three (43) full-time employees, and Plaintiff is one of three minorities among the employees supervised by Carp.  (Doc. No. 20, ¶ 63) (Doc. No. 23-2, ¶¶ 77-78).  The 2010 Census shows that the City of Bethlehem is comprised of thirty-two percent (32%) Hispanics.  (Doc. No. 23-2, ¶ 79).

**A.**     **Plaintiff Wanted a Promotion to a Class 12 Sprayer Position.**

Plaintiff holds an active pesticide sprayer license, and he performs some spraying duties in his current position.  (Doc. No. 20, ¶ 56) (Doc. No. 23-2, ¶¶ 83).  Plaintiff receives compensation at the Class 12 rate on the occasions that he performs pesticide spraying duties, but Plaintiff is not otherwise compensated at the Class 12 rate.  (Doc. No. 20, ¶ 56).  Plaintiff claims that he requested that Carp promote him to a Class 12 sprayer within the Parks Department, but Carp refused.  (Doc. No. 23-2, ¶¶ 81-82).  Carp testified that there has not been an open Class 12 sprayer position in the Parks Department since Carp began working there, and Plaintiff has presented no evidence to the contrary.  (Doc. No. 21, Ex. B, 100:12-101:2).  Plaintiff contends that he has been waiting for the City to post a full time Class 12 pesticide sprayer job, so that he can bid on the position.  (Doc. No. 21, Ex. A, 83:5-6) (Doc. No. 23-2, ¶¶ 83-84).  Caucasian employees have received promotions from Carp.  (Doc. No. 23-2, ¶ 82).

A Class 12 sprayer position at the golf course apparently became vacant at some point in time, but Plaintiff did not apply for the position.  (Doc. No. 20, ¶ 19).  Plaintiff testified that

3

when he went to put his name on the "bid sheet" for the position at the golf course, the position was gone.  (Doc. No. 20, ¶ 19) (Doc. No. 23, ¶ 85).  Instead of filling the open Class 12 position at the golf course, Carp eliminated the position from the budget.  (Doc. No. 23-3, ¶ 86).  The golf course spraying duties are now being performed by the superintendent of the golf course.  (Doc. No. 20, ¶ 20) (Doc. No. 23-2, ¶ 87).  Plaintiff acknowledged that the superintendent of the golf course holds a sprayer license.  (Doc. No. 21, Ex. A, 93:4-6).

On November 18, 2009, Jean A. Zweifel, Director of Human Resources for the City, sent Plaintiff a letter explaining the decision to deny Plaintiff's request for a Class 12 pay increase with respect to his current job duties.  (Doc. No. 21, Ex. C).  Ms. Zweifel explained that Plaintiff was already being compensated at the rate of pay for a Class 12 position for the *limited* occasions when Plaintiff actually performs spraying tasks.  (Doc. No. 21, Ex. C).  Ms. Zweifel also explained that former sprayer position at the golf course was a Class 12 position, because it involved spraying "almost every day."  (Doc. No. 21, Ex. C).  In denying Plaintiff's request, Ms. Zweifel noted that Plaintiff's spraying licensure had been considered, and Ralph Carp had been consulted.  (Doc. No. 21, Ex. C).

**B.     Plaintiff Wanted a Position at the Ice Rink.**

Plaintiff wanted to work at the ice rink, because it involved the opportunity to work overtime.  (Hearing Transcript, 05/29/12, 40:18-22).  Plaintiff contends that he should have been sent to work at the ice rink based on seniority.  (Doc. No. 20, ¶ 28) (Doc. No. 23-2, ¶ 28).  Instead, a Caucasian co-worker, Ed Marks, was given a temporary assignment at the ice rink.  (Doc. No. 20, ¶ 28) (Doc. No. 23-2, ¶¶ 27, 28, 29, 111, 112).  Plaintiff has more seniority than Mr. Marks.  (Doc. No. 20, ¶ 27) (Doc. No. 23-2, ¶¶ 27, 28, 111).  Plaintiff never formally applied

4

for an open position at the ice rink, and it is not clear that Plaintiff ever even asked to work at the ice rink in any capacity.[1]  (Doc. No. 20, ¶ 27) (Doc. No. 23-2, ¶¶ 27, 29).

### C.    Plaintiff Requested Reimbursement for Some License Fees.

Plaintiff attended classes necessary to maintain his pesticide license, and he submitted documentation for the City to reimburse him for some of those classes.  (Doc. No. 23-2, ¶¶ 113-114) (Doc. No. 20, ¶ 52).  Plaintiff testified that he was not reimbursed for some of the classes, because the City required additional documentation, but Plaintiff had nothing else to submit.[2]  (Doc. No. 21, Ex. A, 130:13-18).  Plaintiff was unable to specify exactly what classes he had

---

[1]  Plaintiff testified as follows regarding his application for a position at the ice rink:

> Q: Was there even a bid sheet that came up bidding for the ice rink job?
> A: Probably, yes.  There were probably jobs that came up for that.
> Q: Well, did you ever bid on one?
> A: No.
> Q: So you never were refused one, is that correct?
> A: I never went over there on a bid sheet.  But when it was asked to go over there, I wasn't assigned over there.  I didn't get to go over there.
> . . . .
> Q: If you never bid on a job there, how would you be assigned or not assigned there?
> . . . .
> A: If there was an opening to fill in.
> Q: As a fill in?
> A: Yes.
> Q: So you wanted to go fill in there and weren't assigned to a fill-in job there?
> A: Right.  I wasn't able to fill in.

(Doc. No. 21, Ex. A, 146:13-147:14).

[2]  Specifically, the City reimbursed Plaintiff for fees up to 2010, but Plaintiff was not reimbursed for a ten dollar ($10.00) fee in 2011, for which the City told Plaintiff he had failed to submit an adequate receipt.  (Doc. No. 23-2, ¶ 55) (Doc. No. 20, ¶ 55).

attended for which he was never reimbursed.  (Doc. No. 21, Ex. A, 132:12-15).  Plaintiff did not

request reimbursements after his request was denied in 2011.  (Doc. No. 21, Ex. A, 140:1-141:5).

Plaintiff believes that the City paid for unidentified Caucasian co-workers to attend other kinds

of classes.  (Doc. No. 21, Ex. A, 138:8-131:17).  However, Plaintiff offered no evidence of the

individuals, the classes they took, or the documentation submitted by those individuals.

### D.     Plaintiff Was Disciplined for Fighting with Chuck Yenca.

In January 2008, while acting as the Union Shop Steward, Plaintiff approached a

Caucasian, non-union co-worker, Chuck Yenca, regarding Yenca's overtime work.  (Doc. No.

23-2, ¶¶ 95, 96).  The confrontation escalated to a verbal altercation between Yenca and Plaintiff.

(Doc. No. 23-2, ¶ 96).  Carp documented this incident in a memorandum to Plaintiff on January

17, 2008.  (Doc. No. 20, ¶ 41).  According to Carp's January 2008 memorandum, three City

employees witnessed the incident and reported that Plaintiff was the aggressor.[3]  (Doc. No. 21,

Ex. B).  As a result of the incident, both Plaintiff and Yenca were disciplined by Carp.  (Doc. No.

23-2, ¶¶ 96, 97) (Doc. No. 20, ¶ 39).

Specifically, Yenca and Plaintiff were both required to attend mandatory conflict

resolution counseling.  (Doc. No. 20, ¶ 39).  Additionally, Plaintiff was issued a Final Warning,

or a "Last Chance Agreement," in lieu of suspension based upon his existing disciplinary record.

(Doc. No. 20, ¶ 40) (Doc. No. 23-2, ¶¶ 37, 40).  The January 2008 memorandum cites a prior

altercation with another co-worker, Mike Tulio, at which time Carp instructed Plaintiff to

communicate with co-workers in a professional and respectful manner.  (Doc. No. 21, Ex. B).

---

[3] Plaintiff apparently disputes this, as he testified that Yenca "just flipped out" after
Plaintiff questioned him about overtime work.  (Doc. No. 21, Ex. A, 50:6-20).

The January 2008 memorandum indicates that Plaintiff had failed to follow Carp's instructions regarding getting along with and communicating with co-workers.  (Doc. No. 21, Ex. B).  The memorandum cites "multiple incidents involving you and other employees" in the past year, and notes that Plaintiff had been arrested for violence, which Carp found to be a "disturbing pattern [that] must be addressed."  (Doc. No. 21, Ex. B).  Carp concluded that "[b]ased upon the most recent incident, combined with the other incidents in the past year," the City issued Plaintiff a Final Warning regarding his insubordinate, disruptive, and aggressive behavior.  (Doc. No. 21, Ex. B).  The Final Warning was later limited to one year on the condition that Plaintiff attend anger management classes.  (Doc. No. 20, ¶ 43) (Doc. No. 23-2, ¶ 33).

### E.  Defendant Carp Allegedly Made Comments that Offended Plaintiff.

In 2008, following the altercation between Plaintiff and Yenca, Plaintiff attended a meeting with Carp to discuss the incident.  (Doc. No. 20, ¶ 8).  The meeting took place a couple of days after the altercation.  (Doc. No. 21, Ex. B, 71:5-11).  At the meeting, Carp referred to Plaintiff as "street smart," which Plaintiff found racially derogatory and offensive.  (Doc. No. 20, ¶ 10).  Plaintiff interpreted the comment to mean that Hispanics do not have anything other than street smarts.  (Doc. No. 20, ¶ 11).  In response, Plaintiff asked Carp why he used the term "street smart," and Carp explained that he meant it as a compliment.  (Doc. No. 20, ¶ 10).  The meeting was then adjourned.  (Doc. No. 23-2, ¶ 10).

Plaintiff also described an incident when Plaintiff and Carp were cleaning up Saucon Park, which was "messy" after the weekend.  (Doc. No. 21, Ex. A, 135:1-136:13).  While working together, Plaintiff commented that people from New York and New Jersey came to the park to party on weekends.  (Doc. No. 21, Ex. A, 135:1-136:13).  Plaintiff alleges that Carp

7

responded by stating, "well, it's the minorities that are coming down here."[4]  (Doc. No. 21, Ex. A, 135:1-136:13).  Plaintiff did not report this incident to anyone at the City of Bethlehem, nor did he describe this incident in his EEOC complaint.  (Doc. No. 21, Ex. A, 137:4-21).


III.    LEGAL STANDARD

        Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue is "genuine" if there is sufficient evidence from which a jury could find in favor of the non-moving party.  *Id.*  It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations.  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) *(citing United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 361 (3d Cir. 1987).  If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor."  *Anderson,* 477 U.S. at 255.

        The moving party bears the initial burden of demonstrating that there is no genuine issue

---

        [4]  Defendants deny that Carp ever told Plaintiff that minorities were responsible for messing up the park, but for purposes of this motion, we take the facts in the light most favorable to Plaintiff, and presume for present purposes that Carp made the comment alleged.  (Hearing Transcript, 05/29/12, 50:5-6).

of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).  Once the moving party

carries this initial burden, the non-moving party must "come forward with specific facts showing

there is a genuine issue for trial."  *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.  The non-moving

party must present something more than mere allegations, general denials, vague statements, or

suspicions.  *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884,

890 (3d Cir. 1992);  *Fireman's Ins. Co. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir.

1982).  Instead, the non-moving party must present specific facts and "affirmative evidence in

order to defeat a properly supported motion for summary judgment."  *Anderson*, 477 U.S. at 257.

"If the evidence is merely colorable, or is not significantly probative, summary judgment may be

granted."  *Id.* at 249-50.  If the non-moving party has the burden of proof at trial, then that party

must establish the existence of each element on which it bears the burden.  *Celotex Corp.*, 477

U.S. at 322-23.


IV.     **DISCUSSION**

   A.     **Plaintiff has Fully Exhausted his Administrative Remedies.**

       As a threshold matter, Defendants argue that Plaintiff failed to exhaust his administrative

remedies because his EEOC charge did not raise all of the claims that he now asserts.  (Doc. No.

21 at 8-9).  Defendants are correct that a Title VII plaintiff cannot bring claims in a civil lawsuit

that were not first included in an EEOC charge and exhausted at the administrative level.  *See*

*Burgh v. Borough Counsel of Montrose*, 251 F.3d 465, 469–70 (3d Cir. 2000); *Hicks v. ABT*

*Assocs., Inc.*, 572 F.2d 960, 966 (3d Cir. 1978) (quotation marks omitted); 42 U.S.C. §

2000e–5(e).  However, the Court finds that Plaintiff's EEOC charge alleges race discrimination

9

based on negative references to Plaintiff's race (calling Plaintiff "street smart"); inequitable discipline (referral to a psychiatrist after fighting with Caucasian co-worker, Chuck Yenca); denial of reimbursement for licensing requirements (refusing to use budgeted funds to pay for pesticide license classes); and inequitable treatment regarding promotions (promoting Caucasian co-workers but refusing to allow Plaintiff to work at the ice rink, and refusing to promote Plaintiff to a Class 12 position), which are the same facts alleged in Plaintiff's Complaint.  (Doc. No. 21, Ex. C).  Based on these facts, I find that this civil action could have reasonably been expected to grow out of Plaintiff's EEOC charge.  *See Hicks*, 572 F.2d at 966; *see also Schouten v. CSX Transp., Inc.*, 58 F.Supp.2d 614, 616 (E.D.Pa. 1999) (The administrative exhaustion requirement "is tempered by a fairly liberal construction given to EEOC charges.").  Accordingly, Plaintiff has exhausted his administrative remedies with respect to the discrimination claims alleged in his Complaint.  42 U.S.C. § 2000e–5(e); *Antol v. Perry*, 82 F.3d 1291, 1295 (3d Cir.1996); *DeLa Cruz v. Piccari Press*, 521 F.Supp.2d 424, 431 (E.D.Pa. 2007).

### B.     Plaintiff's Title VII/PHRA Racial Discrimination Claim.

Plaintiff's Amended Complaint does not explicitly state the nature of his Title VII claim.  (Doc. No. 4).  However, at oral argument, counsel for Plaintiff clarified that he asserts a claim for disparate treatment based on unequal disciplinary measures and a failure to promote (Counts I and III).  (Transcript of Hearing, 05/29/12, p. 30-40).  The discipline issue arises from the altercation between Plaintiff and his co-worker, Chuck Yenca.  The failure to promote pertains to a Class 12 pesticide sprayer position.  Plaintiff argues that both issues, discipline and promotion, should be viewed in the context of Ralph Carp's allegedly racially insensitive comments.  (Transcript of Hearing, 05/29/12, p. 30-40).

10

Defendants move for summary judgment on Counts I and III, arguing that Plaintiff cannot prove any racial discrimination.  Defendants also argue that Plaintiff failed to present evidence that he was treated unfavorably with respect to promotion or discipline.  Plaintiff responds that the record contains numerous disputed material facts and that Plaintiff has established a prima facie case of discrimination under Title VII and the PHRA.  (Doc. No. 6).

### 1.      Legal Framework

Plaintiff's claims for race discrimination in Counts I and III are governed by the three prong burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[5]  First, the plaintiff bears the burden of establishing a prima facie case of discrimination.  *See McDonnell Douglas*, 411 U.S. at 802.  Second, if a plaintiff establishes a prima facie case of discrimination, the employer must offer a legitimate, non-discriminatory reason for the adverse employment action.  *Id.*  This burden is one of production, not persuasion. *Smith v. City of Allentown*, 589 F.3d 684, 690 (3d Cir. 2009).  Third, if the employer meets this burden, then the burden shifts back to plaintiff to prove that the employer's reason merely was a pretext for discrimination.  *Id.*; *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410-11 (3d Cir.1999).

To set forth a prima facie case of disparate treatment based on race, a plaintiff must show that: "(1) he is a member of a protected class; (2) he was qualified for the position he sought to attain or retain; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination."  *Makky v.*

---

[5]  PHRA and Title VII claims are analyzed under the same legal standard.  *Wilkerson v. New Media Tech. Charter Sch.*, 522 F.3d 315, 318-19 (3d Cir. 2008), *Atkinson v. LaFayette Coll.*, 460 F .3d 447, 454 (3d Cir. 2006).

*Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008).  As an alternative to the fourth prong, a plaintiff may

show "that similarly situated individuals outside the plaintiff's class were treated more favorably

[than he]." *Glenn v. Raymour and Flanigan*, __ F.Supp.2d__, 2011 WL 6739461, at *7 (E.D.Pa.

Dec. 22, 2011) (*quoting Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 273–74 (3d Cir.

2010) (citations omitted)).  "While 'similarly situated' does not mean identically situated, the

plaintiff must nevertheless be similar in 'all relevant respects.'"  *Opsatnik v. Norfolk Southern

Corp.*, 335 Fed.Appx. 220, 223 (3d Cir. 2009) (citations omitted).  An adverse employment

action is that which affects the employee's "compensation, terms, conditions, or privileges of

employment." 42 U.S.C. § 2000e–2(a).

     "With regard to workplace discipline, the relevant factors to consider in determining

whether individuals are 'similarly situated' may include a 'showing that the two employees dealt

with the same supervisor, were subject to the same standards, and had engaged in similar conduct

without such differentiating or mitigating circumstances as would distinguish the conduct or their

employer's treatment of them.'"  *Glenn v. Raymour and Flanigan*, __ F.Supp.2d__, 2011 WL

6739461, at *7 (E.D.Pa. Dec. 22, 2011) (*quoting McCullers v. Napolitano*, 427 Fed.Appx. 190,

195 (3d Cir.2011) (citations omitted)).  To be "similarly situated," the plaintiff must show that

"the other employee's acts were of 'comparable seriousness.'"  *Anderson v. Haverford College*,

868 F.Supp. 741, 745 (E.D.Pa.1994) (citations omitted).

     Plaintiff's Amended Complaint does not allege individual liability under Title VII, and in

no case can individuals be held liable under Title VII.  *Sheridan v. E.I. DuPont de Nemours &

Co.*, 100 F.3d 1061, 1078 (3d Cir. 1996).  However, Plaintiff's Amended Complaint asserts a

claim against the individual defendant, Defendant Carp, in Count III (PHRA).  Supervisory

employees may be liable under the PHRA if they "aid, abet, incite, compel or coerce the doing of any act" prohibited by the statute.  43 Pa. Cons.Stat. § 955(e); *Dici v. Pennsylvania*, 91 F.3d 542, 552 (3d Cir. 1996).

### 2.      Summary Judgment is Appropriate.

Taken in the light most favorable to Plaintiff, the facts of record are nevertheless insufficient to support a conclusion that Plaintiff can establish a prima facie case of racial discrimination, and that Defendants' stated reasons for the employment action at issue were merely pretextual.  Plaintiff has not demonstrated that a genuine issue of material fact exists as to whether Defendants illegally subjected him to racial discrimination.

### i.      Prima Facie Case of Race Discrimination

Defendants do not dispute that Plaintiff is a member of a protected class and that Plaintiff is qualified to perform a pesticide spraying job.  Nor do Defendants dispute that Plaintiff was never promoted to a Class 12 sprayer, and that he was disciplined for fighting.  Thus, Plaintiff can establish the first three elements of a prima facie case of race discrimination.  However, Plaintiff has not produced competent evidence that an adverse employment action occurred under circumstances that could give rise to an inference of intentional discrimination, or that similarly situated individuals outside of Plaintiff's class were treated more favorably than Plaintiff.

The Court first addresses the failure to promote.[6]  Plaintiff claims that he was denied a

---

[6]  Plaintiff appears to assert the failure to promote as evidence of an adverse employment action occurring under circumstances that could give rise to an inference of intentional discrimination.

promotion to a Class 12 sprayer position,[7] but the record shows that Plaintiff never applied for an open position.  (Doc. No. 23-2, ¶¶ 81-84).  Plaintiff argues that Defendants eliminated the Class 12 golf course position and reassigned "the duties to a less-qualified employee because [Carp] knew Plaintiff would automatically be awarded that position based on seniority."  (Doc. No. 23, p. 12).  Plaintiff argues that the only City employee qualified to perform spraying duties at the golf course is Plaintiff; therefore, Plaintiff should have been given the spraying job at the golf course.[8]  The evidence does not support that position.

It is undisputed that the eliminated golf course spraying position is now being performed by the superintendent of the golf course.  (Doc. No. 20, ¶ 20) (Doc. No. 23-2, ¶ 87).  However, Plaintiff specifically acknowledged in his testimony that the superintendent of the golf course has a certification to spray the golf course greens.  (Doc. No. 21, Ex. A, 93:3-8).  Thus, the evidence shows that the spraying job that Plaintiff wanted was eliminated from the budget, with the job duties absorbed by a qualified and more senior employee – the superintendent of the golf course.  (Doc. No. 20, ¶20) (Doc. No. 21, Ex. B, 100:2-22, 105:4-106:12, 114:16-19).  Additionally, Plaintiff admitted that certain spraying activities that Plaintiff had been performing were no longer being performed by anyone.  (Doc. No. 21, Ex. A, 93:11-94:7).  In short, there is no

---

[7]  Plaintiff's Response to the Motion for Summary Judgment also states that he was wrongfully denied a promotion to Parks Supervisor.  (Doc. No. 21, p. 12-13).  At oral argument, counsel for Plaintiff took the Parks Supervisor position "off the table" with respect to this issue.  (Transcript of Hearing, 05/29/12, 15:5-8).  Counsel confirmed that the only promotion issue pertains to the Class 12 sprayer position.  (Transcript of Hearing, 05/29/12, 36:12-38:9).

[8]  Counsel asserts that "there is nobody in the City of Bethlehem at that golf course, at least as of the deposition of Mr. Carp who holds a certified pesticide – is a certified pesticide applicant, neither the current superintendent or any individual that applies any pesticides."  (Transcript of Hearing, 05/29/12, 34:7-12).  However, as discussed above, as counsel's argument is contradicted by Plaintiff's sworn deposition testimony.

evidence to support Plaintiff's contention that Defendants reassigned spraying duties to less qualified employees.

Further, Defendants state that there was a legitimate budgetary reason for eliminating the Class 12 sprayer position, and counsel for Plaintiff acknowledges the lack of evidence to refute this contention.  (Transcript of Hearing, 05/29/12, 35:17-23).  Instead, Plaintiff argues that "the City recognizes that there has to be a certified pesticide applicator because that is one of the specific requirements they put into the job description relating to the superintendent [of parks]."[9] (Transcript of Hearing, 05/29/12, 36:4-8).  Again, the evidence does not support Plaintiff's position.  The superintendent of the *golf course*, not the superintendent of parks, is the person currently performing the sprayer duties at issue.  As stated above, Plaintiff acknowledged that the superintendent of the golf course is qualified to perform those duties.  Accordingly, there is no evidence of an adverse employment action under circumstances that could give rise to an inference of intentional discrimination based on a failure to promote.

Next, the Court addresses the workplace discipline.[10]  Plaintiff claims that Defendants administered disparate disciplinary treatment to Yenca, a Caucasian employee, and to Plaintiff, a Hispanic employee, for the same incident and the same behavior.  (Doc. No. 23, p. 12).  The incident at issue concerns a verbal altercation between Yenca and Plaintiff, for which Carp

---

[9]  A March 2011 job description for the superintendent of parks lists "possession of specialized certifications as may be required," and pesticide applicator certifications is stated as an example.  (Doc. No. 21, Ex. A, 87:8-9).  Plaintiff testified that he interpreted the superintendent of parks job posting as requiring a spraying operator license.  (Doc. No. 21, Ex. A, 87:6-14).

[10]  Plaintiff appears to raise the workplace discipline as evidence that similarly situated individuals outside of Plaintiff's class were treated more favorably than Plaintiff.

imposed discipline.  Specifically, Yenca and Plaintiff were both required to attend mandatory

conflict resolution counseling, and Plaintiff was also issued a Final Warning, or a "Last Chance

Agreement."  (Doc. No. 20, ¶¶ 39 & 40) (Doc. No. 23-2, ¶¶ 37, 40).  Plaintiff argues that the only

basis for the disparate discipline is Plaintiff's race.  However, the facts do not support Plaintiff's

position.  Plaintiff "cannot sustain a claim simply by asserting an event and then asserting that it

was motivated by racial bias."  *Davis v. City of Newark*, 285 F. App'x 899, 902-03 (3d Cir.

2008).

The evidence shows that Plaintiff was given additional discipline; i.e., the Final Warning,

based on Plaintiff's prior record of poor behavior in the workplace and a pattern of aggression.

(Doc. No. 20, ¶ 40) (Doc. No. 23-2, ¶¶ 37, 40) (Doc. No. 21, Ex. B).  This reasoning is well-

documented in the record, including deposition testimony by Carp and in the January 2008

memorandum outlining the circumstances and justification for the discipline.[11]  (Doc. No. 21, Ex.

B).  There is no evidence that Yenca had a prior track record of discipline issues that would

likewise warrant a Final Warning.  (Transcript of Hearing, 05/29/12, 23:2-15, 48:3-7).  Thus, the

additional discipline given to Plaintiff was based legitimate, non-discriminatory reasons; it had

nothing to do with Plaintiff's race.  In short, Defendants' treatment of Yenca cannot raise an

inference of unlawful discrimination regarding Plaintiff's discipline because there are

---

[11] Carp's memorandum outlining the basis of the discipline notes that Plaintiff had failed
to follow Carp's prior instructions regarding getting along with and communicating with co-
workers. (Doc. No. 21, Ex. B).  The memorandum cites "multiple incidents involving you and
other employees" in the past year and notes that Plaintiff had been arrested for violence, which
Carp found to be a "disturbing pattern [that] must be addressed."  (Doc. No. 21, Ex. B).  Carp
concluded that "[b]ased upon the most recent incident, combined with the other incidents in the
past year," the City decided to issue a Final Warning regarding Plaintiff's insubordinate,
disruptive, and aggressive behavior.  (Doc. No. 21, Ex. B).

differentiating and mitigating circumstances that significantly distinguish both their conduct and Defendants' treatment of them.

ii.      **Reason for the Adverse Employment Action**

Under the *McDonnell Douglas* framework, if a plaintiff establishes a prima facie case of discrimination, the employer must offer a legitimate, non-discriminatory reason for the adverse employment action. *Jones*, 198 F.3d at 410.

Here, even if Plaintiff could establish a prima facie case of discrimination, which the Court finds that he cannot, Defendants have offered legitimate, non-discriminatory reasons for the employment actions at issue. As discussed above, Defendants explain that Plaintiff was not promoted to a Class 12 sprayer position because the job was eliminated due to budgetary reasons. Additionally, Defendants note that Plaintiff is compensated at the Class 12 rate of pay for the limited occasions that he actually performs work at that level; i.e., when he performs spraying duties. Defendants also explain that Plaintiff was properly subject to additional discipline for fighting with his co-worker based on Plaintiff's prior record of poor conduct. The record supports Defendants' stated reasons. Thus, Defendants have met their burden of offering legitimate reasons for the adverse employment actions.

iii.      **Pretext**

If the employer offers a legitimate, non-discriminatory reason for the adverse employment action, then the plaintiff must prove that the employer's reason merely was a pretext for discrimination. *Jones*, 198 F.3d at 410. To establish pretext, a plaintiff must present "some evidence . . . from which a factfinder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more

17

likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). It is not enough that the employer's decision was "wrong or mistaken"; rather, a plaintiff must demonstrate that "the employer's articulated reason was . . . so plainly wrong that it cannot have been the employer's real reason." *Jones*, 198 F.3d at 413. Because "the prima facie case and pretext inquiries often overlap," the Court may consider the same evidence at both stages of the *McDonnell Douglas* analysis. *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 370 (3d Cir. 2008).

Here, Plaintiff generally claims that "the actual reason for the different treatment is Carp's racial animus towards Plaintiff." (Doc. No. 23, p. 11). However, bare allegations that Plaintiff's treatment was based on his race are insufficient to withstand summary judgment. *See Wilson v. Lock Haven University*, 2012 WL 1130593, at *2 (3d Cir. 2012). Plaintiff's general assertions of racial discrimination are based on conclusory and unsupported beliefs, which are insufficient to create a genuine dispute of material fact for trial. *See Habib v. Urban Outfitters, Inc.*, No. 03-CV-1561, 2004 WL 765119, at *6 (E.D. Pa. Apr. 1, 2004) ("A plaintiff's own assertion of racial animus does not give rise to an inference of unlawful discrimination."); *King v. Sch. Dist. of Phila.*, No.00-CV-2503, 2001 WL 856948, at *4 (E.D. Pa. July 26, 2001) ("[C]onclusory and unsupported beliefs are insufficient to create a genuine [dispute] of material fact as to [a] Defendant['s] motivation or [to] support an inference of discrimination based on race."). As discussed above, Defendants have offered well-supported reasons for the disciplinary measures and the failure to promote, and there is no evidence of record to show that the stated reasons were pretextual.

Carp's decision to discipline Plaintiff is supported by the facts concerning Plaintiff's prior history of discipline issues and the City's Code of Ethics, which instructs employees to "maintain a course of conduct at all times which will bring credit to [self] and the City of Bethlehem." (Doc. No. 21, Ex. B at 68).  Defendants' position concerning the Class 12 sprayer promotion is likewise supported by the record, which shows that Plaintiff never applied for an available position and the former Class 12 sprayer position was eliminated due to budget cuts.  (Doc. No. 23-3, ¶ 86).  Even considering Carp's allegedly derogatory statements concerning minorities, which the Court addresses below, there is no competent evidence that Defendants' reasons for the discipline were pretextual.  There is simply no evidence that Defendants acted on a racial animus towards Plaintiff.

Plaintiff claims that Carp made offensive and racially derogatory comments.  Specifically, Plaintiff claims that Carp called Plaintiff "street smart" and that Carp said minorities were responsible for messing up the public parks.[12]  (Doc. No. 20, ¶ 10) (Doc. No. 21, Ex. A, 135:1-136:13).  Plaintiff claims that the intent behind Carp's comments is a question of fact.  However, Plaintiff has failed to explain how Carp's intent behind his comment is a *material* question of fact.  As discussed below, one or two instances of potentially offensive comments in this case do not rise to the level of severe and pervasive conduct sufficient to support a hostile work environment claim.  Nor do the facts show the comments are tied to an adverse employment action.  Even if Carp had intended to insult Plaintiff based on his race, there is no evidence that

---

[12]  Defendants deny that Carp ever said that minorities were responsible for messing up the parks, and Defendants deny that Carp's "street smart" comment was a negative reference to Plaintiff's race.  (Hearing Transcript, 05/29/12, 50:4-12).

Carp administered unequal discipline or denied a promotion *based on race*.[13]  Thus, the intent

behind Carp's comments does not present a material question of fact that would preclude

summary judgment.

Plaintiff received additional discipline for starting a fight with a co-worker, and Plaintiff

never received a promotion to a Class 12 pesticide sprayer.  Nevertheless, no reasonable juror

could conclude that these employment actions were based on Plaintiff's race.  Accordingly,

because Plaintiff has failed to state a prima facie case, and because alternatively Defendants'

legitimate basis is not pretextual, the Court will grant summary judgment in favor of Defendants

as to Plaintiff's Title VII and PHRA claims.

### C.    Plaintiff's Equal Protection Claim.

Plaintiff's Amended Complaint does not explicitly explain the nature of his equal

protection claim (Count II).  However, at oral argument, counsel for Plaintiff clarified that he

asserted an equal protection claim based on the City of Bethlehem's refusal to reimburse Plaintiff

for certain fees related to his pesticide license and the refusal to allow Plaintiff to work at the ice

rink.  Plaintiff also argues that his equal protection claim should be considered in the context of

the racial profile of the City.  (Doc. No. 4) (Transcript of Hearing, 05/29/12, p. 30-40).

Defendants move for summary judgment on Count II, arguing that Plaintiff cannot prove

any racial discrimination.  Defendants argue that Plaintiff's claims should be dismissed because

Plaintiff has failed to allege any official proclamation, policy or edict by a decision maker, and

because Plaintiff cannot establish that Carp, as a policymaker, failed to act despite an obvious

---

[13]  As discussed above, the evidence shows that Defendants had legitimate, non-discriminatory reasons for the employment actions at issue, and the evidence does not establish that Defendants' reasons were pretextual, even in light of Carp's comments.

need.

### 1.    Legal Framework

Section 1983 does not itself confer substantive rights, but provides a remedy for redress when a Constitutionally-protected right has been violated under the color of state law.  *See Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985); *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir.1997).  Claims for a violation of the Fourteenth Amendment's rights of equal protection, under 42 U.S.C. § 1983, like those under Title VII, require that Plaintiff demonstrate "purposeful discrimination."  *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990).  A claim brought pursuant to 42 U.S.C. § 1983 also requires that defendants "exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."  *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 23 (3d Cir. 1997) (internal quotations omitted).

To establish a section 1983 action against Carp (the individual defendant), Plaintiff must show that Carp personally acted under color of law to cause, or had actual knowledge of and acquiesced in, an alleged intentional deprivation of a constitutionally-protected interest.  *See Hafer v. Melo*, 502 U.S. 21, 25 (1991); *McQueen v. Philadelphia Housing Authority*, No. 02-8941, 2003 WL 22533726, at *3 (E.D.Pa. Sept. 26, 2003).  To prevail on this claim against the City, a municipal entity, Plaintiff must show that the deprivation was caused by official policy, custom or usage, and deliberate conduct. *See Monell v. Dept. of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (rejecting municipal liability by virtue of respondeat superior and announcing standard); *Berg v. County of Allegheny*, 219 F.3d 261, 275 (3d Cir.2000); *Simmons v. City of Philadelphia*, 947 F.2d 1042 (3d Cir.1991).  Plaintiff must also, to impose

liability, demonstrate a plausible nexus of causation between an unlawful policy or custom and the injuries alleged.  *See Tuttle*, 471 U.S. at 823.

### 2.      Summary Judgment is Appropriate.

Plaintiff claims that Carp, acting in his official capacity, made work assignments and reimbursement decisions based on nothing other than Plaintiff's race.  Specifically, Plaintiff claims that Ed Marks, a Caucasian employee, was assigned to work at the ice rink even though Plaintiff had seniority over Marks.  (Doc. No. 23-2 ¶ 111).  Plaintiff also claims that Defendants refused to "reimburse Plaintiff for work-related classes while paying for Caucasian employee to attend non work-related classes."  (Doc. No. 23, p. 12).  While Carp may have been involved in assignment and reimbursement decisions, Plaintiff has failed to show that any such decisions were motivated by intentional race-based discrimination.

Counsel argues that Plaintiff's deposition testimony is evidence of a custom, policy, or practice of discrimination, but counsel never articulated the policy allegedly evidenced by his client's testimony.  (Transcript of Hearing, 05/29/12, p. 30-40).  This, itself, is fatal to Plaintiff's Equal Protection claim, as a claim against a municipality for violation of a constitutionally-protected right must be supported by competent evidence that a municipal custom, policy or practice caused the violation.  *See Monell, supra.*

Further, the facts show that Plaintiff never formally applied for an open position at the ice rink, and it is not clear that Plaintiff ever even asked to work at the ice rink in any capacity.[14]

---

[14]  Plaintiff testified as follows regarding his application for a position at the ice rink:

> Q: Was there even a bid sheet that came up bidding for the ice rink job?
> A: Probably, yes.  There were probably jobs that came up for that.

(Doc. No. 20, ¶ 27) (Doc. No. 23-2, ¶¶ 27, 29).  Plaintiff has simply presented no evidence that

assigning Mr. Marks to work at the ice rink was an intentional deprivation of Plaintiff's

constitutional rights.  Moreover, "[t]he Court does not sit as a super employment court to decide

the merits of employment decisions."  *Allen v. PetSmart, Inc.*, 512 F. Supp. 2d 288, 296 (E.D. Pa.

2007).  In Defendants' view, Mr. Marks was an appropriate fill-in for the position at the ice rink.

Mere disagreement by the Plaintiff with that decision is insufficient to allow Plaintiff to survive

summary judgment.  Therefore, there is insufficient evidence to support Plaintiff's claim that

work assignments were based on race.

Likewise, there is insufficient evidence to support Plaintiff's claim that reimbursements

were based on race.  Plaintiff acknowledges that Defendants provided a legitimate, non-

discriminatory reason for denying a ten dollar reimbursement request in 2011, and that Plaintiff

did not pursue any further reimbursements.  (Doc. No. 21, Ex. A, 130:13-18, 140:1-141:5).

---

> Q: Well, did you ever bid on one?
> A: No.
> Q: So you never were refused one, is that correct?
> A: I never went over there on a bid sheet.  But when it was asked to go over there, I wasn't assigned over there.  I didn't get to go over there.
> . . . .
> Q: If you never bid on a job there, how would you be assigned or not assigned there?
> . . . .
> A: If there was an opening to fill in.
> Q: As a fill in?
> A: Yes.
> Q: So you wanted to go fill in there and weren't assigned to a fill-in job there?
> A: Right.  I wasn't able to fill in.

(Doc. No. 21, Ex. A, 146:13-147:14).

Indeed, Plaintiff acknowledges that Defendants regularly approved Plaintiff's requests for reimbursements prior to 2011.  While Plaintiff claims that the City paid for Caucasian co-workers to attend other classes, Plaintiff does not identify the co-workers, the classes they attended, or the type of documentation required for any such reimbursements.  (Doc. No. 21, Ex. A, 138:8-131:17).  Thus, Plaintiff presents insufficient evidence to support his claim that reimbursement decisions were based on race.

In sum, Plaintiff has failed to proffer sufficient evidence from which a reasonable fact finder could conclude that Carp acted under color of law in a way that intentionally violated, or acquiesced in an intentional violation of, Plaintiff's right to equal protection.  The record lacks evidence of any official municipal policy or custom that caused the deprivation of a constitutionally-protected right.  For these reasons, Defendants are entitled to summary judgment on Plaintiff's claims under section 1983.

**D.      Hostile Work Environment.**

Plaintiff appears to assert a hostile work environment claim based on the allegedly racist comments by Carp.[15]  (Doc. No. 4, ¶ 45).  To the extent that Plaintiff wishes to pursue a hostile work environment claim (and it is not clear that he does),[16] the Court finds that Plaintiff's claim fails.

---

[15]  Count I of Plaintiff's Amended Complaint states only that Defendants' conduct in violation of Title VII "conformed to the company culture of discrimination of minorities and maintaining a hostile and offensive workplace for Plaintiff."  (Doc. No. 4, ¶ 45).

[16]  At oral argument, the Court requested clarification of the facts supporting each claim, and Plaintiff did not identify any facts in support of a hostile work environment claim. (Transcript of Hearing, 05/29/12, p. 30-40).  Additionally, Plaintiff's Response to the Motion for Summary Judgment fails articulate a hostile work environment claim.  (Doc. No. 23).

Under Title VII, a plaintiff can establish a claim based on a racially hostile work environment if he can show that: (1) he suffered intentional discrimination on account of his race; (2) it was pervasive and regular; (3) it detrimentally affected him; (4) it would have detrimentally affected a reasonable person in his position; and (5) there is a basis for vicarious liability against the employer. *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005). The "conduct must be extreme to amount to a change in the terms and conditions of employment." *Caver*, 420 F.3d at 262 (*quoting Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

In determining the existence of a hostile work environment, a court must examine the "totality of the circumstances," rather than assessing each piece of evidence in isolation. *West v. Philadephia Elec. Co.*, 45 F.3d 744, 753 (3d Cir. 1995); *Andrews v. City of Phila.*, 895 F.2d 1469, 1482 (3d Cir.1990). The Third Circuit has articulated several factors for courts to examine, including: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance. *See Weston v. Pennsylvania*, 251 F.3d 420, 426 (3d Cir.2001) (*citing  Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

Plaintiff has not come forward with any competent record evidence that would support his contention that Carp's comments were intended as racial slurs. Plaintiff cannot rest on bald allegations to defeat summary judgment, he must come forward with affirmative evidence, in the form of record facts, to support his claim. *See Liberty Lobby,* 477 U.S. at 257; *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989). While it is not necessary for a Title VII defendant to use words that overtly implicate racial animus to create a hostile work environment, comments that cannot be reasonably construed as invoking any racial feeling do not

support Title VII liability.  *Davis v. City of Newark*, 285 F. App'x 899, 902-03 (3d Cir. 2008).

Here, Carp's "street smart" comment does not reasonably invoke any racial feeling.  Even

crediting Plaintiff's factual contentions (as we must for present purposes), Plaintiff has failed to

establish that Carp's conduct was sufficiently severe or pervasive as to alter the conditions of his

employment.

 A reviewing court must examine the totality of the circumstances when determining

whether the alleged harassment is sufficiently severe or pervasive to constitute a hostile work

environment.  *Andrews*, 895 F.2d 1469 at 1482.  The Supreme Court has "made it clear that

conduct must be extreme to amount to a change in the terms and conditions of employment."

*Faragher*, 524 U.S. at 788.  Factors to consider include "the frequency of the discriminatory

conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive

utterance; and whether it unreasonably interferes with an employee's work performance."

*Harris*, 510 U.S. at 23.

 Taken in the light most favorable to Plaintiff, the facts of record are insufficient to

support a conclusion that Carp's conduct was sufficiently pervasive to support Plaintiff's hostile

work environment claim.  Plaintiff testified that Carp refused to respond when Plaintiff asked

Carp if he had a problem with minorities.  (Doc. No. 21, Ex. A, 142:15-144:2).  Plaintiff also

testified that Carp made two comments that Plaintiff found to be offensive.  First, Plaintiff

testified that Carp called him "street smart."  Second, Plaintiff testified that Carp referred to

"minorities" as "messing" up the public park.  These separate incidents, which involved one

individual and took place over the course of more than two years, are not sufficiently pervasive.

 Beyond the lack of pervasiveness, none of the incidents Plaintiff describes reasonably

could be construed as "severe."  Carp's comment regarding minorities messing up the parks may have been unprofessional, but it was not so extreme as to amount to a change in the terms and conditions of Plaintiff's employment.  Regarding the "street smart" comment, the Court fails to see how the term, uttered on an isolated occasion, could objectively be viewed as offensive or harassing.  *See Harris v. Forklift Sys.,* 510 U.S. 17, 21-22 (1986) (to fall within the purview of Title VII, the conduct in question must be severe and pervasive enough to create an "objectively hostile or abusive work environment-an environment that a reasonable person would find hostile-and an environment the victim-employee subjectively perceives as abusive or hostile."). The remaining incident is not a situation where Carp even made a racially charged comment.[17] Additionally, there is no contention (much less evidence) that any of these incidents involved a physical threat or public humiliation.

Carp's comments may have been unprofessional, and Plaintiff may have been offended. Nevertheless, no reasonable juror could conclude that the conduct was so severe or pervasive that it altered the conditions of Plaintiff's employment, and thus created an abusive environment. Accordingly, to the extent Plaintiff asserts a claim for hostile work environment, summary judgment is appropriate.

---

[17]  Carp's refusal to respond to *Plaintiff's* question about his view of minorities was a decision *not* to discuss race.

27

## V.      CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment is granted, and

Plaintiff's Complaint will be dismissed.

An appropriate Order follows.


BY THE COURT:


    /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
UNITED STATES MAGISTRATE JUDGE